Filed 12/31/24

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | A165276 |
| v. | |
| CHRISTIAN ALEJANDRO MAY QUINTERO, | (Sonoma County Super. Ct. No. SCR7167881) |
|     Defendant and Appellant. | |
| THE PEOPLE, | |
|     Plaintiff and Respondent, | A165277 |
| v. | |
| FREDI ANALBERTO LOPEZ-FLORES, | (Sonoma County Super. Ct. No. SCR7167882) |
|     Defendant and Appellant. | |

In the published portion of this opinion, we conclude that the prosecution's use of the race-neutral terms "monsters" and "predators" in closing argument did not violate the California Racial Justice Act of 2020 (RJA) (Pen. Code, § 745),[1] when the evidence established that the defendants found the victim in an inebriated state, alone in the street in the middle of

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the introduction, the factual and procedural background, part V of the discussion, and the disposition are certified for publication.

[1] All statutory references are to the Penal Code unless otherwise stated.

the night; took her into their car; drove her 50 miles away; and committed multiple sex crimes in concert against her. Nothing in the record suggests the terms were used to explicitly or implicitly appeal to racial bias.

Fredi Analberto Lopez-Flores and Christian Alejandro May Quintero were convicted by a jury of forcible rape in concert (§§ 261, 264.1, subd. (a); counts 1, 5); forcible sodomy in concert (§ 286, subd. (d)(1); count 2); forcible oral copulation in concert (§ 288a, subd. (d)(1); counts 3, 6); forcible rape by a foreign object in concert (§§ 289, subd. (a), 264.1, subd. (a); count 4); and related enhancements, including that they kidnapped the victim and that the movement of the victim substantially increased the risk of harm. Quintero contends the prosecutor committed misconduct during closing arguments in violation of the RJA and due process. Lopez-Flores joins Quintero's claims of prosecutorial error. Lopez-Flores also contends his convictions on counts 1–4, which were based on his aiding and abetting, are not supported by substantial evidence. He further asserts various instructional errors. Both defendants raise sentencing errors. We reject each of the defendants' arguments and affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Prosecution Case*

On April 13, 2018, Jane Doe, who was 24 years old, went out with friends to several bars in San Francisco. Doe drank a "good amount" of alcohol. Around 2:00 a.m. on April 14, 2018, Doe's friends ordered her a rideshare car to take her home. Her friends walked her to the car and confirmed with the rideshare driver that he had the correct destination address. Doe recalled that the car was white and she was the only passenger.

Doe did not speak to the rideshare driver. When the driver stopped at a red light at the intersection of Stanyan and Fulton Streets, Doe got out of

2

the car without saying anything. The driver called out and told her that they had not reached her destination. Doe did not respond. She was standing in the middle of the street, holding her phone. The light turned green, and the driver went through the light and pulled over to call the rideshare company's support. The driver was told by the rideshare company's support to end the trip, which he did at 2:32 a.m. The driver turned around and drove back to the intersection. He did not see Doe again.

Doe remembered getting into the rideshare car, and the next thing she remembered was being in a different car. She did not remember how she got in the second car. She was sitting on the left side of the back seat, and another passenger, later identified as Quintero, was sitting close to Doe on her right. Quintero and the driver, who was later identified as Lopez-Flores, spoke to each other in a language that Doe did not understand. It seemed that they knew each other. Doe had never seen either of them before.

When Doe noticed they were driving on the freeway, she realized something was wrong. She asked Lopez-Flores if they would take her home, but he did not respond. Quintero started touching Doe, and she told him to stop. Quintero punched the right side of her face and head, and he choked her. She screamed loudly and begged Quintero to stop. Lopez-Flores did nothing to help. Quintero continued to punch and choke Doe, and he told her in English to stay quiet. Doe was punched and choked by Quintero for about 15 to 20 minutes. She was afraid for her life, and she eventually gave up resisting.

After about 45 minutes, the car stopped in a parking lot in Sonoma. Lopez-Flores got out of the car. Quintero took off Doe's shorts and underwear and pushed her shirt above her chest. He touched her vagina with his hand. He put his fingers in her vagina for a few minutes. He kissed her on her lips

3

and touched and kissed her right breast. Quintero then put his penis in Doe's vagina. He was not wearing a condom. He raped her for about 15 minutes. Then he sodomized Doe for a few minutes. Finally, he forced her to orally copulate him. After he finished sexually assaulting Doe, he got out of the car.

Doe tried to move into the driver's seat, hoping to see if she could start the car to escape. Before she reached the front seat, Lopez-Flores entered the car's back seat and pulled Doe back. Doe initially thought Lopez-Flores would help her. She asked him to take her home. He told her in English to be quiet. Lopez-Flores covered Doe's mouth and hit the left side of her head a couple of times. He pulled his pants and underwear down below his knees, and he forced Doe to sit on him while she faced forward, toward the front seat. Lopez-Flores put on a condom and then put his penis in her vagina. Then he sodomized Doe before grabbing the back of her head and forcing his penis into her mouth. This assault lasted about 15 to 20 minutes. When Lopez-Flores was finished, he pulled up his pants and let Doe out of the car. Quintero got back in the car. Doe was wearing only socks and a tank top. They threw her shorts and her phone case out of the car and then drove away. Doe did not have her phone, her identification, her shoes or her purse. She did not know her location. She eventually put her clothes on and started to look for help.

Doe was in pain and was crying as she walked in the dark for about 10 to 15 minutes before she met employees of a grocery store and asked them to call 911. The police were dispatched to the grocery store at 4:47 a.m. and arrived within five minutes. Doe reported she had been raped by two men in a rideshare car. A responding officer observed that Doe's face was swollen and she had blood around her mouth and nose and red marks on her neck. She was distraught but did not appear intoxicated.

4

Doe was taken to the hospital, and a SART examination was conducted. The SART nurse practitioner documented swelling and bruising on Doe's face, temples, jaw, eyes, chin, cheeks, neck, arms, and legs. Doe had abrasions on the roof of her mouth and a laceration on her lip. She also had two abrasions on the exterior of her vagina.

Detective Brian Parks of the Sonoma County Sheriff's Office investigated the case. Based on his initial interview with Jane Doe, Parks arrested the driver of the rideshare vehicle Doe initially ordered in San Francisco. However, the driver of the rideshare vehicle had surveillance video showing that he was not in Sonoma at the time of the assault and evidence that he continued driving for the rideshare service after Doe left his car. The rideshare driver was released. Parks spoke with Doe again on April 15, 2018, and she told him that she received a cancellation fare receipt from the rideshare company and that she had a vague memory of exiting the vehicle. Parks investigated Doe's cell phone location data and surveillance videos for locations along Doe's route from the vicinity of Fulton and Stanyan Streets in San Francisco to Sonoma. Based on his review of hundreds of hours of video surveillance, Parks identified a black Dodge Magnum with a blue LED around its license plate as the suspect vehicle. The vehicle pulled into a parking spot at a shopping plaza in Sonoma at 3:30 a.m. on April 14, 2018. The vehicle was visible on video collected from the grocery store where Doe went for help after the assault.

Video from other locations in Sonoma show the vehicle driving through the town to the parking lot. The vehicle parks at 3:34 a.m., which was consistent with Doe's cell phone location data. A man believed to be the driver exits the vehicle and walks toward a nearby gas station. A few minutes later, the man walks back toward the parking lot. At 4:00 a.m., a

5

man believed to be the passenger is standing next to the vehicle. Parks believed he was acting as a lookout. At 4:23 a.m., the vehicle backs out of the parking lot and idles until 4:32 a.m., when it drives down the street proceeding south. A woman, believed to be Doe, stands where the vehicle had been and begins walking north. The woman's hysterical crying is audible on the video.

Video from the interior of the gas station showed the man believed to be the driver enter the store, make a purchase, leave, and then return to make a second purchase. Store records showed the man purchased cigarettes and then returned three minutes later to purchase condoms.

Parks alerted law enforcement to the color, make and model of the suspect vehicle and photos of the man who entered the interior of the gas station. Lopez-Flores was identified by the Novato Police Department, which conducted a traffic stop of the Dodge Magnum on May 5, 2018. Lopez-Flores was the registered owner of the vehicle. Parks arrested Lopez-Flores on June 1, 2018, and obtained a search warrant for his phone and his vehicle. The records received pursuant to the search warrant revealed the following: On the evening of April 13, 2018, there were two phone calls between Lopez-Flores and a contact listed in Lopez-Flores's phone as "Amigo." Parks identified defendant Quintero as associated with the phone number listed for "Amigo" in Lopez-Flores's phone. Quintero's address was on a street within 60 yards of location of the parking lot where the assault occurred. Quintero was arrested on June 2, 2018.

Lopez-Flores's and Quintero's DNA were compared to samples taken from Doe's body and clothing. Lopez-Flores's DNA was detected in sperm cell fractions of samples taken from Doe's neck and underwear. Lopez-Flores's DNA matched a saliva sample taken from Doe's breast. Quintero's DNA was

6

detected in the sperm cell fractions of samples from Doe's neck, underwear, shorts, and a perianal swab. Quintero's DNA was also detected in a swab from Doe's vagina.

## II.   *Defense Case*

Quintero did not testify or call any witnesses on his behalf. Lopez-Flores testified that he knew Quintero from work at a bakery. On April 13, 2018, Quintero called Lopez-Flores and asked him for a ride to San Francisco to pick up money from cockfights. Lopez-Flores agreed to take him for $50. They arrived in San Francisco around 5:30 p.m. They later met with Quintero's cousin and went to a bar and other locations in San Francisco. Quintero was drinking and using drugs. Around 1:00 a.m. on April 14, 2018, they left a bar with Quintero's cousin and drove to the cousin's home to drop him off. Quintero got out of the car with his cousin, and the cousin handed Quintero an object wrapped in a sweater. Quintero got back in the car and told Lopez-Flores that Quintero's girlfriend wanted them to pick her up. Lopez-Flores drove a short distance, and Quintero told him to park. Quintero got out of the car and came back within a couple of minutes with Doe. Quintero and Doe kissed before they got in the car. Lopez-Flores could tell Doe had been drinking. He asked her in Spanish if Quintero was her boyfriend, and she answered, " 'Yeah.' " Lopez-Flores started driving back to Sonoma.

Within five minutes, Quintero started punching Doe and she screamed. Lopez-Flores stopped the car and told Quintero to leave her alone. Quintero pointed a gun at Lopez-Flores, threatened to kill him, and told him to drive to Sonoma. Lopez-Flores was afraid for Doe because he has a sister who had been raped. He continued driving and could see that Quintero continued hitting Doe in the backseat and pushing her head against the car door. Doe

7

was screaming and begging for help. Quintero was beating Doe so badly that Lopez-Flores thought she would be killed.

Lopez-Flores drove slowly at the Golden Gate Bridge toll booth, hoping they would be recorded. He did not call the police, but he planned to look for a patrol car that he knew was often in San Rafael. When he arrived in San Rafael, he stopped the car in the middle of the freeway and got out. The patrol car was not there. Lopez-Flores saw Quintero attempting to get into the driver's seat, and Lopez-Flores went back to the car and told Quintero he would take him where he wanted to go. Quintero told Lopez-Flores that if he stopped again Quintero would shoot him.

Lopez-Flores continued driving to Sonoma. Quintero spoke to him forcefully and hit him with the nozzle of his gun.[2] Lopez-Flores drove slowly by other spots where he usually saw police cars, but they were not there. When they got to Sonoma, Lopez-Flores drove to a parking lot where he saw a camera. He wanted to be recorded to "demonstrate that [he] wasn't in agreement with what was happening." Quintero again threatened Lopez-Flores with the gun and told him to go to a gas station to get condoms.

Lopez-Flores walked to a gas station and bought coffee and cigarettes. He left the store and then remembered that Quintero had threatened him, so he went back into the store to buy the condoms. He did not notify the store clerk or call the police while he was away from Quintero. He was not thinking about contacting the police at that point because he had already tried to look for police cars several times. He was focused on getting back to the car, where he thought Doe's life was in danger, and he was also thinking about his sister, who had been raped.

---

[2] Doe testified that she did not see either defendant with any type of weapon.

When Lopez-Flores returned to the car, he saw Quintero throwing clothing out the window, and he knew that Quintero had "already harmed the girl . . . ." Quintero got out of the car, naked. Doe was leaning toward the door, and she was also naked. Doe asked in English for Lopez-Flores to take her back to San Francisco. Although Lopez-Flores did not understand English, he understood Doe's request. He told her he did not have gas or money for gas. He was sitting next to Doe in the back seat while he tried to talk to her, but he knew she was not understanding him. Lopez-Flores touched Doe's leg and told her to move over, and he started looking for her clothes. Then he opened the door for her, told her to get out, and gave her her clothes. Quintero opened the front passenger door, took something from the car, and then left. Doe put her clothes on, and Lopez-Flores walked her toward the street. He saw a limousine in the parking lot and told Doe to go there for help. Lopez-Flores did not call the police at that point because he was afraid of Quintero. He started driving home, but after thinking about his sister, he went back to look for Doe. He wanted to take her where she needed to go with whatever gas was left in his car. He saw that Doe was talking to three people, and he thought they would take her back to San Francisco, so he left the area.

Lopez-Flores denied having sex with Doe and said he gave the condoms to Quintero but that they were not used. After the assault, Quintero called Lopez-Flores and told him that they both had to go into hiding. Lopez-Flores said he did not do anything and did not need to hide. He also told Quintero that if the police talked to him he would tell them what happened. Quintero threatened to shoot Lopez-Flores and sent him a photo of a weapon. Quintero also threatened him while they were in jail.

When Lopez-Flores was arrested, he was interviewed by Parks. During the interview, Lopez-Flores denied that Quintero had a gun. At trial, Lopez-Flores testified he was afraid to tell Parks that Quintero had had a gun.

## III. *Prosecution Rebuttal*

Parks testified that he interviewed Lopez-Flores for three hours on May 31, 2018. Initially, Lopez-Flores denied ever having been to San Francisco. Then he said he had only been there once, in the daytime. When Parks presented evidence of his being in San Francisco on the night of the assault, Lopez-Flores admitted being there. Lopez-Flores told Parks that he and Quintero were driving through San Francisco after leaving a bar. Quintero asked Lopez-Flores to pull over so he could urinate. Quintero got out of the car and grabbed Doe, who was in the street, and forced her into the car. Lopez-Flores believed Doe was taken against her will. He thought Doe may have been " 'a prostitute.' " Doe began screaming for help as soon as she got in the car, and Quintero started hitting her. Quintero started to touch Doe sexually. Lopez-Flores told Doe to calm down and that he would help her. Lopez-Flores did not see Quintero with a gun at any point that evening.

When Parks asked Lopez-Flores what he purchased at the gas station in Sonoma, he initially said coffee and cigarettes. He later said he also bought condoms. Lopez-Flores told Parks that when he left the car to go to the gas station, he believed Quintero was going to rape Doe. When Parks asked Lopez-Flores if he also had sex with Doe, Lopez-Flores initially said that when he got back to the car Doe immediately got out of the car. Parks told Lopez-Flores that he had contrary video evidence. Lopez-Flores then admitted that he got into the back seat, where Doe was completely naked.

10

Lopez-Flores admitted he touched her leg and maybe her shoulder, but said, " 'From what I remember, I didn't have sex with her.' "

## DISCUSSION

### I. *Substantial Evidence Supports Lopez-Flores's Aiding and Abetting Convictions (Counts 1–4)*

Lopez-Flores was convicted of six "in concert" sex crimes. In two of the counts (count 5, forcible rape in concert, §§ 261, 264.1, subd. (a); and count 6, forcible oral copulation in concert, § 288a, subd. (d)(1)), Lopez-Flores was the direct perpetrator. Counts 1–4 charged forcible rape in concert (§§ 261, 264.1, subd. (a); count 1); forcible sodomy in concert (§ 286, subd. (d)(1); count 2); forcible oral copulation in concert (§ 288a, subd. (d)(1); count 3); forcible rape by a foreign object in concert (§§ 289, subd. (a), 264.1; count 4); and alleged Quintero was the direct perpetrator and Lopez-Flores aided and abetted Quintero.

Lopez-Flores contends the prosecution did not present substantial evidence that he aided and abetted Quintero's sexual assaults against Doe (counts 1–4) and that the trial court erred when it denied his section 1118.1 motion at the close of the prosecution's case. He argues there is no evidence that he had knowledge of or specific intent to aid and abet each sex crime.

We review the denial of a motion for judgment of acquittal pursuant to section 1118.1 to determine whether, based on the evidence, including all reasonable inferences to be drawn therefrom, there is substantial evidence of each element of the charged offenses. (*People v. Dalton* (2019) 7 Cal.5th 166, 249.) The same standard applies when the prosecution relies on circumstantial evidence. (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.) " 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)

11

"Acting in concert occurs when 'the defendant, voluntarily acting in concert with another person, by force or violence and against the will of the victim, . . . either personally *or by aiding and abetting the other person*,' commits rape, penetration with a foreign object, or sodomy. [Citations.] The ' "acting in concert language" ' [covers] *both* the person who committed the physical act and the person who aided and abetted. [Citation.]" (*People v. Adams* (1993) 19 Cal.App.4th 412, 429, disapproved on other grounds in *People v. Chhoun* (2021) 11 Cal.5th 1, 38.) " 'It . . . exhibits a legislative recognition that [sexual assault] is even more reprehensible when committed by two or more persons. [Citations.]' " (*People v. Adams*, at p. 429.)

A defendant is guilty of a sex crime in concert as an aider and abettor if (1) the direct perpetrator committed the sex offense; (2) the aider and abettor knew of the direct perpetrator's unlawful intent; (3) before or during the commission of the sex offense, the defendant intended to aid and abet the perpetrator in committing the crime; and (4) the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the sex offense. (*People v. Middleton* (2023) 91 Cal.App.5th 749, 775.)[3]

Lopez-Flores argues the prosecution's case in chief did not present substantial evidence of Lopez-Flores's knowledge or specific intent to aid Quintero in the commission of the sex crimes committed by Quintero as alleged in counts 1–4. He argues the prosecution's case was based on speculation. We disagree.

---

[3] A defendant may also be responsible as an indirect aider and abettor when the defendant intended to facilitate one offense and it is reasonably foreseeable that other crimes are the natural and probable consequence of the target offense. (*People v. Prettyman* (1996) 14 Cal.4th 248, 260–261 (*Prettyman*), superseded in part by Sen. Bill No. 1437 (2017–2018 Reg. Sess.).) However, here the prosecution proceeded on a theory of direct aider and abettor liability and the jury was instructed with CALCRIM No. 401.

The record includes evidence that Lopez-Flores drove Doe, who was screaming for help in the backseat and being hit and choked by Quintero, from San Francisco to Sonoma in the middle of the night. During the drive, he spoke with Quintero multiple times in a language Doe did not understand, and it "definitely seemed like they knew each other." When they got to Sonoma, Lopez-Flores parked his car in an empty parking lot and left Quintero alone with Doe. He walked to a nearby gas station to buy condoms. While he was gone, Quintero assaulted Doe by putting his fingers in her vagina, raping her, sodomizing her, and then forcing Doe to orally copulate him. Quintero got out of the car, and within a minute Lopez-Flores got in. Lopez-Flores then raped Doe, sodomized her,[4] and forced her to orally copulate him. Based on this evidence, a jury could reasonably infer that Lopez-Flores had knowledge of Quintero's intent to commit multiple sex acts against Doe and that Lopez-Flores intended to, and did, aid Quintero in committing each offense. (*People v. Lopez* (1981) 116 Cal.App.3d 882, 888 [defendant need not be physically present during perpetrator's sex offense to be convicted as an aider and abettor].)

## II.    *Lopez-Flores's Convictions on Counts 5 and 6*

Lopez-Flores was convicted on count 5 (forcible rape in concert; §§ 261, 264.1, subd. (a)) and count 6 (forcible oral copulation in concert; § 288a, subd. (d)(1)) as a direct perpetrator. He argues that these convictions must be reversed because the jury was instructed with CALCRIM No. 1191B, which allowed the jury to use the counts 1–4 aiding and abetting crimes to conclude that he was likely to commit the direct perpetrator offenses charged in counts

---

[4] Lopez-Flores was not charged with sodomy as a direct perpetrator. However, Doe testified that he sodomized her.

13

5 and 6.[5] Lopez-Flores does not contend that it was improper to instruct with CALCRIM No. 1191B. (See *People v. Villatoro* (2012) 54 Cal.4th 1152, 1167–1168 [approving use of CALCRIM No. 1191, modified to apply to charged sex crimes in same case].) Rather, he argues that the jury may have relied upon his counts 1–4 aiding and abetting crimes to reach its verdicts on counts 5 and 6, and because he claims his convictions on counts 1–4 were not supported by substantial evidence, his convictions on counts 5 and 6 must also be reversed. As discussed *ante*, we reject Lopez-Flores's argument that there was insufficient evidence to support his convictions on counts 1–4. Therefore, his derivative argument that his convictions on counts 5 and 6 must be reversed also fails.

## III.    *Failure to Instruct on Aiding and Abetting Natural and Probable Consequences Doctrine*

Lopez-Flores argues that the trial court erred by failing to instruct sua sponte on the natural and probable consequences theory of aiding and abetting liability. His argument is convoluted and appears to be based in part on his position—which we reject—that substantial evidence does not

---

[5] The jury was instructed: "The People presented evidence that the defendants committed the crimes of forcible rape by acting in concert, sodomy by acting in concert, oral copulation by acting in concert and rape by foreign object acting in concert as charged in Counts 1–6. [¶] If the People have proved beyond a reasonable doubt that a defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case. [¶] If you find that a defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt." (CALCRIM No. 1191B.)

14

support Lopez-Flores's convictions on counts 1–4 as a direct aider and abettor. As we understand Lopez-Flores's argument, he asserts that although the prosecution did not request an instruction on the natural and probable consequences theory (CALCRIM No. 402) and did not rely upon this theory in its closing argument, the trial court nonetheless had a sua sponte duty to give the instruction because during voir dire the prosecution "inserted" the natural and probable consequence theory into the case and incorrectly explained the theory.

"There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 158, superseded by statute on another ground as noted in *People v. Gentile* (2020) 10 Cal.5th 830, 849.) A trial court's sua sponte duty to instruct on the natural and probable consequences doctrine "arises only when the prosecution has elected to *rely* on the 'natural and probable consequences' theory of accomplice liability and the trial court has determined that the evidence will support instructions on that theory." (*Prettyman, supra*, 14 Cal.4th at p. 269.)

### A. Additional Facts

During voir dire, the prosecutor discussed an example of aiding and abetting a bank robbery in which the direct perpetrator robbed the bank and also robbed a bank customer of a necklace. The prosecutor, referring to the getaway driver's culpability, stated, "So, in California, if during the commission of a target crime, which is the bank robbery, co-defendant or

15

co-participant commits a separate crime that is likely or foreseeable or a natural and probable consequence of the charged crime, the driver, me, can be held responsible for both robberies also; the bank robbery and the secondary robbery that I didn't really know anything about, but it happened during the course of the robbery that I did know something about." Lopez-Flores contends the prosecution's statement during voir dire failed to accurately state that the natural and probable consequences doctrine requires that the additional offense committed by the direct perpetrator be " 'reasonably foreseeable.' "

At the jury instruction conference, neither the defendants nor the prosecutor requested that the jury be instructed with CALCRIM No. 402, "Natural and Probable Consequences Doctrine (Target and Non-Target Offenses Charged)," which states, in relevant part, "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes." The trial court stated that it would give CALCRIM Nos. 400 (Aiding and Abetting: General Principles) and 401 (Aiding and Abetting: Intended Crimes). At the conclusion of the conference, the trial court asked the parties if there were any other requested instructions, and none of the parties requested further instructions. The jury was instructed: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and, [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

16

During closing argument, the prosecution did not mention the natural and probable consequences doctrine. Instead, it argued that Lopez-Flores was liable as an aider and abettor for the sex acts committed by Quintero because (1) Quintero committed the sex acts; (2) Lopez-Flores knew Quintero intended to commit the sex acts; (3) Lopez-Flores intended to aid and abet Quintero; and (4) Lopez-Flores's words and conduct did, in fact, promote or encourage Quintero's sexual assault. Regarding Lopez-Flores's knowledge of Quintero's intent, the prosecution referenced Lopez-Flores's statement to Parks.[6]

## B. Analysis

According to Lopez-Flores, the jury may have used the prosecutor's imprecise statement during voir dire to find him guilty of counts 1–4 under a natural and probable consequences theory even though the jury was not instructed on this theory. He argues that the prosecutor's closing argument on the direct aider and abettor theory was "full of holes" because the People did not specifically argue when Lopez-Flores knew Quintero was going to commit each of the sex offenses. Therefore, he claims, the jury may have supplemented the direct aider and abettor theory with the natural and probable consequences theory even though it was not instructed with the latter theory. Lopez-Flores's argument is meritless.

" '[A]s a general matter, it is unlikely that errors . . . occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors . . . "prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings . . . ." ' " (*People v. Thomas* (2012) 53 Cal.4th 771, 797.) The purpose of voir dire is to

---

[6] Parks testified that Lopez-Flores told him that when he got out of the car he believed Quintero was going to rape Doe.

17

ensure a fair and impartial jury. (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1308, 1312.) Statements made, or questioned posed, by attorneys during voir dire, or at any time during the trial, are not evidence, as the jury was instructed. (CALCRIM No. 222.) The jury was also instructed that "[y]ou must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.)

Further, the jury was properly instructed as to the prosecution's theory of direct aider and abettor liability. There was a brief mention of the natural and probable consequences doctrine during voir dire. However, the fact that the prosecution did not request an instruction on natural and probable consequences or mention the theory during its closing argument makes clear that the prosecution was relying only on direct aider and abettor liability. The trial court had no duty to instruct on the natural and probable consequences doctrine because the prosecutor did not rely on this theory. (*Prettyman, supra*, 14 Cal.4th at p. 269.)

We also agree with the People that Lopez-Flores could not possibly have been prejudiced by the purported error. We assume the jury followed all the instructions given, including the instruction regarding direct aider and abettor liability, for which there was substantial evidence. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) Lopez-Flores presents only a cursory analysis of prejudice from the purported error in failing to instruct on the natural and probable consequences doctrine. He claims that if the jury had been instructed with the natural and probable consequences doctrine, then it would have been required to determine whether a reasonable person in Lopez-Flores's position would have or should have known that the charged sex offenses in counts 1–4 were a reasonably foreseeable consequence of

18

Lopez-Flores's acts of aiding and abetting. We are unconvinced that a jury instructed with the omitted instruction would have rendered a different verdict.

## IV.  *Failure to Instruct on Conspiracy*

Lopez-Flores next contends his convictions on counts 1–4 must be reversed because the trial court gave an agreed-to instruction on accomplice testimony, which referenced conspiracy, but did not sua sponte instruct on the definition of conspiracy. This claim, too, fails.

Lopez-Flores's testimony implicated Quintero. After discussion with the parties regarding the appropriate instruction regarding accomplice testimony, the parties agreed the trial court should give CALCRIM No. 334, with certain bracketed portions excised. The jury was instructed: "Before you may consider the statement or testimony of Fredi Lopez-Flores as evidence against defendant Christian Quintero regarding [counts 1–4], you must decide whether Fredi Lopez-Flores was an accomplice to that crime. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if: [¶] 1. He or she personally committed the crime; [¶] OR [¶] 2. He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 3. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime. . . ." The instruction further explained that if the jury decided Lopez-Flores was an accomplice, then it may not convict Quintero of counts 1–4 based on Lopez-Flores's testimony alone. Instead, corroborating evidence is required, and an accomplice's testimony should be viewed with caution. (CALCRIM No. 334.)

19

The parties agreed CALCRIM No. 334 was the proper instruction to be given, and they agreed with the trial court's decision to excise certain bracketed portions of the standard instruction that were not applicable. Neither Lopez-Flores nor any other party asked the trial court to define conspiracy for the jury. As the People correctly argue, Lopez-Flores has forfeited this claim by failing to raise it below. (*People v. Hart* (1999) 20 Cal.4th 546, 622 [" 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].)

Even if Lopez-Flores had not forfeited this claim, we would reject it. The defendants were not charged with conspiracy, and the People did not argue the defendants were guilty based on a conspiracy theory. The instruction given on accomplice testimony specifically states that it applies in the context of the jury's consideration of Lopez-Flores's testimony *as against Quintero*: "If you decide that Fredi Lopez-Flores was an accomplice, then you may not convict Christian Quintero of [counts 1–4] based on Fredi Lopez-Flores's statement or testimony alone." It does not provide the elements of the various crimes alleged against Lopez-Flores. (CALCRIM No. 334.) The jury was also instructed on the principles of aiding and abetting (CALCRIM Nos. 400, 401) and the elements of rape in concert (CALCRIM No. 1001), oral copulation in concert (CALCRIM No. 1016), sodomy in concert (CALCRIM No. 1031), and sexual penetration in concert (CALCRIM No. 1046). Each of the "in concert" instructions refers to aiding and abetting. They do not refer to conspiracy and, in fact, state that "the People do not have to prove a prearranged plan or scheme to commit [the sex offense]." We find no merit to Lopez-Flores's claim that it was necessary to define conspiracy

20

referenced in CALCRIM No. 334 in order to prevent the jury from using a general understanding of conspiracy to convict Lopez-Flores of counts 1–4 as an aider and abettor of Quintero. The jury was properly instructed on the elements of aiding and abetting and the "in concert" crimes charged. It was also instructed with the standard accomplice instruction on corroboration, which by its terms applied to the jury's consideration of evidence against Quintero. We presume the jury followed these instructions. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 436.)

## V. Prosecutorial Error and Racial Justice Act Violation in Closing Argument

Quintero asserts that during closing argument, the prosecution committed misconduct and also violated the RJA when the prosecutors[7] referred to defendants as " 'predators' " and " 'monsters' " and attempted to evoke the jury's sympathy for the victim. Lopez-Flores joins in Quintero's argument. Quintero also argues that his trial counsel provided ineffective assistance by failing to object to the prosecutors' improper argument.

### A. Additional Background

During closing argument, the first prosecutor discussed the credibility of witnesses and highlighted aspects of Doe's testimony that were "authentic," such as "when Jane Doe was asked who knows about what happened to you on the night of April the 14th? She mentioned her boyfriend knew. She had told her boyfriend, and it took her sometime [*sic*] to tell her parents. The response she gave as it relates to her mother was I knew that telling her was going to be more painful for her to hear what happened to me than the torture that I went through. That is as real as it gets."

---

[7] Two assistant district attorneys tried the case, and they both presented closing argument to the jury.

21

The prosecutor then discussed a video timeline of events that had been admitted into evidence and argued, "The evidence suggests at roughly 2:38 is when she was taken. You can see the car with her in it driving in the Presidio in San Francisco. And you wonder to yourself, 10 or 15 minutes into the drive, what's happening to Jane Doe right now? Is she being beaten? Is she being strangled? Is her head being slammed into the door? Is she crying for help at this time? Right now it's been about 50 minutes after she was taken, her ability to resist has been beaten out of her, no longer on the freeway, no idea where she is. Imagine what was going through her mind right now."

The prosecutor described what was shown in surveillance videos, including Jane Doe walking away after the assault and stated, "It's tough to imagine what Jane Doe was thinking after she's let out of that car walking down what to her is some random street in some random town, she has no means of communication, and solely at the mercy of either a bad actor or a good samaritan. Thankfully for her she ran into William [B.] who ended up being a good samaritan."

While discussing the elements of the aggravated kidnapping special allegation, the prosecutor argued, "Substantial increase in the risk of harm, not just physical harm, also includes psychological harm. As it relates to psychological harm, Jane Doe told you that four years later she'll be sitting at work in an environment where nobody knows what happened to her and she will get a flashback and she will have to leave. What's wrong with this person? Why can't she keep her stuff together? Nobody knows. She's too ashamed to tell anyone."

The prosecutor closed by stating: "This case is gonna be yours. . . . But to be fair, even though you have an important decision ahead of you, this case

22

will never truly be your case.  This case belongs to Jane Doe.  There is a human being that was inside of that car.  There was a human being that was brutalized and it changed her life forever.  She is the one that has to find a way to pick the pieces up and put one foot in front of the other.  She's the one at the age of 24 years old [who] lost her innocence, lost her youthfulness when she was kidnapped and raped by those two monsters that are sitting over there.  She's the one that has been forced to live in her own private hell of an emotional prison because of how ashamed she feels.  She's the one that all these years later suffers flashbacks at work that are triggered for no apparent reason.  It's like any emotion or memory that's formed in trauma, it takes you right back to that place, to that evening as if you never left it.  In the courtroom though it's an even playing field.  In the courtroom it's not about height or weight or strength of the defendants.  Ladies and gentlemen, even though this case is overflowing with despair, there's hope in this case.  Even though Jane Doe appeared quiet and reserved and gentle, even meek, she spent two days with us here showing us tremendous courage.  She detailed the most private, the most intimate horror a woman can live through . . . in the most public way.  She testified that three people on earth know what happened to her.  She's explained it now in front of all of you.  Harder than that was going into all those details in front of both of those defendants.  It's hard to watch Jane Doe's testimony and not feel in some way she at least in part blames herself for what happened.  It's hard to think of a woman in the back of a stranger's car begging for help and help is not coming.  You, as members of this jury, who have an incredible opportunity to help Jane Doe understand this is not your fault.  You were kidnapped, tortured, raped and abused by monsters.  We've got your back."

After the defendants' closing arguments, the second prosecutor argued in rebuttal, stating: "Throughout this trial for the better part of a month you heard every woman's greatest fear of your life, every man's greatest fear for his wife, his daughter, his mother, his friend. To be so caught off guard in a vulnerable position and preyed upon [by] two men who see your vulnerability, to be so brutally beaten and physically controlled by punching, strangulation, a smothering of your cries or attempts to fight back are completely useless. Rape is a very special kind of violence completely unparalleled in its traumatic effect on its victims. And it's something women do, little things, sometimes unconscious every single day to prevent themselves against. It's the covering, closing your jacket when someone is looking at you in ways that doesn't [sic] make you feel comfortable even if they do or say, that's not enough. It's being tuned into a man that's walking behind you, it sounds like he's getting closer when there's no one else around, putting your keys in between your fingers like little daggers when you're walking to a parking lot by yourself at night or having the call feature open just in case you have to call 911. It's walking impaired when it's late at night, it's taking your drinks directly from your bartender, it's having your two friends walk you to your [rideshare car] to make sure that you get in safely so you can get home. Women do these things to prevent and protect themselves against the most unimaginable violence against their bodies. And on April 14th of 2018 the victim went out with her friends. She felt safe, comfortable, and for some unknown reason, unknown to all of us, including herself, she got out of the first car, she got out of the [rideshare car], and she ordered [another rideshare car] for 24 hours in the future, and while she's standing there in the road, in the middle of the night, San Francisco, she's vulnerable, and two violent predators saw their prey. They took her off the street. They took her.

24

And they beat her into submission, she laid there limp like a dead body. Mr. Lopez-Flores testified that she was more dead than alive by the time she got to Sonoma.  More dead than alive."

The prosecutor summarized the victim's testimony, detailing the multiple sexual assaults, and then argued:  "Mr. Lopez-Flores and Quintero, they are violent, violent rapists.  They preyed upon a smaller, weaker, vulnerable woman who was just hoping to get home safely.  She didn't have the privilege of hearing the words, this is your stop, you're home.  Instead, she was traumatized and brutally beaten for multiple hours across multiple counties in the most horrific way imaginable.  She was gang raped.  She was gang raped.  They took turns using her body as if it belonged to them.  And that video you watched of Pacific Rim where the only thing you can hear is the victim's cries, that sound feels like it will never stop.  It [is] so primal, it is so gutteral [*sic*], it is so broken.  That's how they left her.  And despite having every reason in the world, every reason in the world to only care about her own pain and trauma, within a couple of hours of this happening, she won't let law enforcement speak to her mom because in a quote it will hurt her more than it hurt me.  These men, they're not heroes, either of them. They are both violent rapists and predators and they are guilty—they are guilty of every single offense they have been charged with, Counts 1 through 6 and not a single lesser.  They are guilty and I ask that you found [*sic*] them so.  They were working together.  This was a coordinated and orchestrated attack at the victim that was targeted at satisfying their own sexual needs and desires at any cost—any cost.  They wanted more, more, more until they had decided they had enough.  And she got up and testified and I submit to you she was saying enough.  Enough.  She isn't just a victim of these two predators.  That's not what a victim is.  She survived.

25

She is a survivor.  And these two defendants, they're predators, they're violent sexual predators, and we ask that you find them guilty."

### B.    Prosecutorial Error

#### 1.    Legal Principles

"[A] prosecutor's 'misbehavior "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " '  [Citation.] 'Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.'  [Citation.] When, as here, misconduct is asserted 'based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " '  [Citation.]" (*People v. Nadey* (2024) 16 Cal.5th 102, 184 (*Nadey*).)

Generally, prosecutorial misconduct claims are forfeited unless the defendant makes a timely and specific objection at trial and requests that the jury be admonished to disregard the improper statements.  (*Nadey, supra*, 16 Cal.5th at p. 185.)  "Failure to raise a timely objection and request an admonition will be excused only ' "if doing either would have been futile, or if an admonition would not have cured the harm." '  [Citation.]  However, ' "[a] defendant claiming that one of these exceptions applies must find support for his or her claim in the record.  [Citation.]  The ritual incantation that an exception applies is not enough." '  [Citation.]" (*Ibid.*)

" ' "Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." ' " (*People v. Fayed* (2020) 9 Cal.5th 147, 207.)  Prosecutors have wide latitude in closing

26

argument to comment on the evidence and reasonable inferences based on the evidence. (*People v. Leon* (2015) 61 Cal.4th 569, 606 (*Leon*).) They are not required to discuss violent crimes "dispassionately or with philosophic detachment." (*Ibid.*) However, " ' "[i]t is . . . improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' " ' " (*Id.* at pp. 605–606.) " 'As a general rule, a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim.' " (*Id.* at p. 606.)

2.    Analysis

Defendants did not object to, or request admonitions regarding, the prosecutors' use of the terms "monster" and "predator," or to their statements that they now claim improperly evoked sympathy for Doe. Nor is there any basis in the record to conclude that a request for an admonition would have been futile. Defendants' claims are forfeited. (*Nadey, supra*, 16 Cal.5th at p. 185.)

However, because Quintero alleges his counsel provided ineffective assistance by failing to object to the prosecutors' allegedly improper statements during closing argument, we find that even if the defendants' claims were not forfeited, they are without merit.

In general, a prosecutor's closing argument should focus on a defendant's conduct based on the evidence and avoid name calling. However, based on this record, we find the prosecutors' descriptions of defendants as "monsters" and "predators" were within the " ' "wide range of descriptive comment" ' " (*Leon, supra*, 61 Cal.4th at p. 606) that is permissible during

27

argument.[8]  Evidence showed that the defendants committed multiple brutal crimes against Doe, whom they found in an inebriated state alone in the street in the middle of the night.  Doe was taken into defendants' car and driven 50 miles away.  She was beaten and choked repeatedly during the drive, and was then raped and sodomized by each defendant and forced to orally copulate them.  Describing the defendants as "prey[ing]" on Doe and referring to them as "predators" and even "monsters" were permissible based upon the evidence.  (*People v. Farnam* (2002) 28 Cal.4th 107, 168 [no misconduct when prosecutor referred to defendant in rape and murder case as monstrous, cold-blooded, vicious and a predator].)

Nor do we find that the prosecutors improperly appealed to the jury's sympathy for Doe.  When considered in context of the closing argument as a whole (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894), we find the prosecutors' statements that Doe had difficulty telling her mother about the incident, had flashbacks while at work, and seemed to blame herself for what happened all fall within the prosecutors' wide latitude to fairly comment on the evidence, including reasonable inferences and deductions from the evidence.  (*Leon, supra*, 61 Cal.4th at p. 606.)

Asking the jury to imagine what Doe felt while being driven to Sonoma with two strangers in the middle of the night, and commenting generally on women's fear of rape, are closer to the line of permissible argument.  (*Leon, supra*, 61 Cal.4th at p. 606.)  However, even if we were to find that these comments improperly appealed to the jury's sympathy for the victim, there is no reasonable probability that the verdict would have been more favorable to the defendants without the purported misconduct.  (*People v. Martinez* (2010)

---

[8] We separately address *post* defendants' claim that the use of these terms violated the RJA.

47 Cal.4th 911, 957.) Given the overwhelming evidence of defendants' guilt, including DNA evidence, surveillance video, the testimony of Doe, and Lopez-Flores's own testimony and statements to Parks, it is not reasonably probable that the jury was influenced by sympathy for the victim based upon the prosecutors' statements in closing argument. (*Ibid.*) Furthermore, the jury was instructed to "not let bias, sympathy, prejudice, or public opinion influence your decision." We presume the jury followed the trial court's instructions. (*Ibid.*)

## C. Racial Justice Act

Defendants argue that the prosecution's use of the terms "monster" and "predator" during closing argument violated the RJA (§ 745) because such terms are dehumanizing when used against the defendants, who are of Latino descent and non-English speakers. We find the defendants' claims forfeited, but because Quintero alleges ineffective assistance of counsel for the failure to raise an RJA claim in the trial court, we consider the merits. (*People v. Singh* (2024) 103 Cal.App.5th 76, 116–117 (*Singh*).)

### 1. Legal Principles

The RJA became effective on January 1, 2021. (§ 745, added by Stats. 2020, ch. 317, § 3.5.) It provides, "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) Four enumerated categories of conduct, if proven by a preponderance of the evidence, establish a violation of the RJA. (§ 745, subd. (a)(1)–(4).) As relevant here, it is a violation of the RJA if "[d]uring the defendant's trial, in court and during the proceedings, . . . an attorney in the case . . . used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity,

29

or national origin, whether or not purposeful.  This paragraph does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).)  " 'Racially discriminatory language' " is defined as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin.  Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (§ 745, subd. (h)(4).)

A defendant may raise an RJA claim as follows:  "A defendant may file a motion pursuant to this section, or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a).  For claims based on the trial record, a defendant may raise a claim alleging violation of subdivision (a) on direct appeal from the conviction or sentence.  The defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section." (§ 745, subd. (b).)  "A motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation.  A motion that is not timely may be deemed waived, in the discretion of the court." (§ 745, subd. (c).)

2.    Analysis

As discussed *ante*, defendants did not object to the prosecutors' use of the terms "monster" or "predator" during closing argument or allege a

30

violation of the RJA.  The People argue the claim is forfeited.  After submitting their respondent's brief, the People filed a notice of new authority informing us of *People v. Lashon* (2024) 98 Cal.App.5th 804, which held that an RJA claim may be deemed forfeited on direct appeal if such a claim could have been, but was not, asserted in the trial court.  (*Id.* at p. 813.)  We agree with *Lashon*'s reasoning and conclude that the defendants forfeited their RJA claim by failing to raise it in the trial court.  (*Ibid.*)  However, because Quintero asserts that his counsel was ineffective for failing to raise the RJA claim, we consider the merits.  (*Singh, supra*, 103 Cal.App.5th at pp. 116–117.)

The defendants argue that the prosecutors' use of the terms "monster" and "predator" violated the RJA because such terms are dehumanizing and should be regarded as explicit animal references when applied to persons of color.  They acknowledge that on multiple occasions our Supreme Court has determined that a prosecutor's use of such terms may be permissible in the context of heinous crimes.  (See *People v. Sully* (1991) 53 Cal.3d 1195, 1249–1250; *People v. Spencer* (2018) 5 Cal.5th 642, 687–688; *People v. Montes* (2014) 58 Cal.4th 809, 890; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1172, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Chatman* (2006) 38 Cal.4th 344, 407; *People v. Farnam* (2002) 28 Cal.4th 107, 168.)  However, they argue that the RJA now forbids the use of such dehumanizing terms against persons of color.

The RJA defines " '[r]acially discriminatory language' " to include "racially charged or racially coded language" and "language that compares the defendant to an animal . . . ."  (§ 745, subd. (h)(4).)  Such language may explicitly or implicitly appeal to racial biases and inject racism and unfairness into a defendant's trial.  We agree that in certain contexts the

31

term "monster" may be suggestive of an animal or beast and that prosecutors should refrain from describing defendants as "monsters." However, here the prosecutor's use of the term twice during the People's fairly lengthy closing argument was in the context of describing the defendants' vicious crime during which they abducted Doe off the street, drove her to a secluded location, and then each defendant raped and sodomized her and forced her to orally copulate them—and was more akin to stating that the defendants' actions were extremely cruel. The term itself is race-neutral, and its use here does not suggest either implicit or explicit bias against the defendants.

The terms "predator" and "prey" were used more extensively by the prosecutors during closing argument. These too are race-neutral terms. The defendants argue that " 'predator' " is defined as " 'an animal that lives by predation.' " (See Webster's Ninth New Collegiate Dict. (1984) p. 926.) However, the terms "predator" and "prey" are commonly used in reference to human behavior as well. (See Merriam-Webster's Collegiate Dict. <https://unabridged.merriam-webster.com/collegiate/predator> [as of Dec. 30, 2024; defining "predator" as "one who injures or exploits others for personal gain or profit"]; Merriam-Webster's Unabridged Dict. <https://unabridged.merriam-webster.com/unabridged/prey> [as of Dec. 30, 2024; defining "prey" as "to commit violence or robbery or fraud"].) Indeed, our own laws use the terms "predator" and "predatory" in reference to human behavior. Under the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.), individuals who have certain mental health disorders and have been convicted of a sexually violent offense are defined as "sexually violent predators." (Welf. & Inst. Code, § 6600, subd. (a)(1).) The SVPA also defines " '[p]redatory' " as meaning "an act . . . directed toward a stranger, a person of casual acquaintance with whom no substantial

relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (Welf. & Inst. Code, § 6600, subd. (e).) Here, the prosecutors' use of the terms "predator" and "prey" during closing argument undoubtedly referred to defendants' conduct of abducting Doe, who was inebriated and alone, off the street in the middle of the night; driving her 50 miles away to a secluded location; beating and choking her; and committing multiple acts of sexual violence in concert against her. Characterizing defendants' conduct as predatory was justified based on the evidence, and we do not find that an objective observer would conclude that the prosecutors' comments appealed to racial bias either explicitly or implicitly. (§ 745, subd. (h)(4).)

The defendants fail to persuade us that had their counsel made a timely motion asserting that the People violated the RJA by using the terms "monster" and "predator" during closing argument, the motion would have been granted. Thus, they have not established either the deficient performance or the resulting prejudice required to prevail on a claim of ineffective assistance of counsel. (*Singh, supra*, 103 Cal.App.5th at p. 120.)[9]

## VI.  *Sentencing*

The defendants contend the trial court erred in sentencing them to consecutive terms on each count under section 667.6, subdivision (d) because there was insufficient evidence that each offense occurred on a separate occasion. Lopez-Flores also contends that as to the counts on which he was convicted as an aider and abettor (counts 1–4), it was error for the trial court to base its "separate occasions" determination solely on Quintero's conduct

---

[9] Lopez-Flores argues that his convictions should be reversed based upon cumulative error. As discussed *ante*, Lopez-Flores has not established any prejudicial errors. Accordingly, individually and cumulatively, there was no reversible error.

and mental state as the direct perpetrator. Both defendants also contend that the Sixth Amendment requires that the factual determination of whether the offenses occurred on separate occasions must be determined by a jury.

## A. Legal Principles

"Section 1170.1 governs most determinate sentencing. For certain sex offenses, however, the Penal Code establishes two alternative sentencing frameworks. First, under section 667.6, subdivision (c) . . . , 'a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion.' This is '[i]n lieu of the term provided in Section 1170.1.' [Citation.] . . . Second, under section 667.6(d), if the sentencing court finds that multiple sex offenses carrying determinate terms involved separate victims or were committed on separate occasions, '[a] full, separate, and consecutive term shall be imposed for each violation' . . . ." (*People v. Catarino* (2023) 14 Cal.5th 748, 752 (*Catarino*).)

Thus, under subdivision (d) of section 667.6, it is mandatory for the court to impose full, separate, and consecutive terms once the court makes the predicate finding that the crimes involved separate victims or occurred on separate occasions. (*Catarino, supra*, 14 Cal.5th at pp. 753–754.) "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of

34

whether the crimes in question occurred on separate occasions." (§ 667.6, subd. (d)(2).)

Alternatively, section 667.6, subdivision (c) gives the trial court discretion to impose full, separate, consecutive sentences if the crimes involve the same victim on the same occasion. The trial court is required to provide a statement of reasons justifying its decision to impose the harsher provisions of section 667.6, subdivision (c). (See *People v. Belmontes* (1983) 34 Cal.3d 335, 347–348 ["The crucial factor . . . is that the record reflect recognition on the part of the trial court that it is making a separate and additional choice in sentencing under section 667.6, subdivision (c)"].)

### B. Additional Facts

#### 1. <u>Aggravating Factors</u>

The People alleged multiple factors in aggravation relating to the crime and to the defendants. They also alleged that in March 2018, Lopez-Flores was convicted of intimidation of a victim (§ 136.1, subd. (b)(1)) and that this was a prior strike conviction and a serious or violent felony. Both defendants waived their right to a jury trial on the aggravating factors, and Lopez-Flores also waived his right to a jury trial on the truth of his prior conviction. Following the jury verdicts, the trial court conducted the bifurcated portion of the trial. The People submitted a certified copy of Lopez-Flores's prior conviction and explained that the offense was committed on November 19, 2017; Lopez-Flores pleaded guilty on January 25, 2018; and he was sentenced to five years of felony probation on March 8, 2018. The trial court found the prior conviction true.

The trial court also found true that the current crimes involved great violence and great bodily harm, threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness or callousness. It also found

the victim was particularly vulnerable and that the defendants engaged in violent conduct indicating they are a serious danger to society.  As to Lopez-Flores, the trial court found that his prior convictions as an adult are numerous or of increasing seriousness, and noted that he was on probation at the time of the current offenses.

### 2. Lopez-Flores's Sentence

At the sentencing hearing, the People requested that the trial court run each defendant's sentences consecutively under section 667.6, subdivision (c).

Lopez-Flores made an oral motion to strike his prior conviction under section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. His counsel argued that Lopez-Flores played a subordinate role and that failing to strike his prior conviction would result in disparate sentences.  He also argued that the sentences for each offense should run concurrently because they were "essentially a single episode" in one location.  Lopez-Flores also made a statement in which he denied responsibility and said he was a victim of Quintero, who had threatened him.  The trial court denied Lopez-Flores's motion to strike his prior conviction.

The trial court then proceeded to sentencing.  It began by stating, "To call this case horrific is an absolute understatement.  This was one of thee [*sic*] worst sexual assaults I have ever witnessed as a judge or as an attorney.  This case was everyone's nightmare.  The nightmare of having two strangers abduct you off the side of the road, viciously and repeatedly beat that victim to near death over a 40 mile drive was just—just awful."  It then found that under section 667.6, subdivision (d) the sentences would run consecutively.  The court explained:  "When evaluating the evidence that was presented at trial in making the determination that 667.6 [subdivision (d)] applies . . . , the Court considered that regarding the sex offenses, the forcible

36

sex offenses committed by Mr. Quintero, those were different sex offenses beginning with—I can't recall the exact order at this time, but the convictions were for different acts; forcible oral copulation, forcible sodomy, forcible digital penetration and forcible sexual intercourse. Considering the fact that those offenses necessarily require repositioning of both Mr. Quintero and Jane Doe, but also were distinct acts, the Court does believe that those . . . fall under 667.6 [subdivision (d)] sentencing. Similarly with the two acts committed by Mr. Lopez-Flores for which there was a conviction, there was a period of time in which Mr. Lopez-Flores was out of the vehicle at the gas station drinking coffee and smoking a cigarette. Certainly he had time for any reflection during that period. When he was in the vehicle, Mr. Lopez-Flores' own testimony was that he was in the vehicle for 15 minutes. That's consistent with Jane Doe's testimony. Again the convictions, 5 and 6, were two separate and distinct sex acts, and so the Court finds that under 667.6 [subdivision (d)] those would also be mandatory consecutive. *However, if the Court's incorrect about that, under 667.6 [subdivision (c)], the Court would still impose consecutive sentencing on Counts 1 through 6.* Specifically, as the Court noted, based on the horrific nature of this offense, the dishonesty of Mr. Lopez-Flores after swearing to tell the truth during his testimony. The aggravating factors that were found true by the Court. And so for all those reasons, the Court would find sentencing under 667.6 [subdivision (c)] if [subdivision (d)] was in error." (Italics added.)

The trial court sentenced Lopez-Flores on each count to 25 years to life, doubled to 50 years based on the prior strike, consecutive to five years, for a total sentence of 300 years to life consecutive to 30 years.

37

### 3. Quintero Sentence

The trial court explained its sentence to Quintero as follows: "Mr. Quintero, the Court's already made mention regarding the horrific nature of this offense. The physical description Mr. Lopez-Flores gave during his testimony in which he balled up his fists and repeatedly reenacted the manner in which you beat Jane Doe along with the description that she gave of how you beat her and the injuries the Court observed from the photographs were awful. It was awful. The Court cannot even fathom what was going through her mind as she was beaten, choked, her head smashed against the wall or the side of the door. When she described thinking she was going to die, the Court believed that that's really what she thought was happening and [in] some ways it's remarkable that it didn't. [¶] The Court was particularly appalled at the sexual assault that you committed in this case. The fact that you sodomized Jane Doe and then you forced her to orally copulate your penis is repulsive and incredibly degrading. The Court believes your conduct was extremely violent and ruthless. [¶] When considering sentencing pursuant to section 667.6 [subdivision (d)], the same considerations that the Court made in regards to Mr. Lopez-Flores would apply in your case as well. [¶] The Court does believe that these are separate acts committed against the same victim. And that's based on the fact that these were all four separate and discreet sex acts. Albeit, they may have taken place all in the back of the vehicle, they all necessarily required the changing of position as well as removing your penis from one location in Jane Doe's body and inserting it in another. *However, again if the Court is in error on that, the Court does believe that pursuant to section 667.6 [subdivision (c)] the Court would sentence you to consecutive terms for each sex act based on the similar reasons that the Court gave for Mr. Lopez-Flores including the*

38

*aggravating factors which were found true in your case; the violent and ruthless nature of the offense, the repulsive and degrading manner in which it was committed, the extreme violence that you inflicted. The Court does not believe that your youth at the time of the offense,*[10] *your lack of a prior record, or any other arguments made by [defense counsel] would mitigate this offense in the eyes of the Court."* (Italics added.)

Quintero was sentenced to consecutive terms of 25 years to life on each count, for a total of 150 years to life.

## C. Analysis

The defendants argue that the trial court's finding that each sex offense occurred on a separate occasion is erroneous because it is not supported by substantial evidence. Lopez-Flores further contends, contrary to the holdings in *People v. Farr* (1997) 54 Cal.App.4th 835 and *People v. McPherson* (2001) 86 Cal.App.4th 527,[11] that the mandatory punishment of consecutive sentences under section 667.6, subdivision (d) does not apply to aiders and abettors. Both defendants also contend that the trial court's imposition of full consecutive sentences pursuant to section 667.6, subdivision (d) violated the Sixth Amendment because the factual predicates of the statute were not found true beyond a reasonable doubt by a jury.

---

[10] Quintero was 24 years old on the date of the offense.

[11] *People v. Farr, supra,* 54 Cal.App.4th 835, "conclude[d] that there is no requirement that defendants personally have committed the enumerated sexual offenses in section 667.6, subdivision (d) in order for the court to be required to have imposed full term consecutive sentencing." (*Id.* at p. 847) *People v. McPherson, supra,* 86 Cal.App.4th 527, "agree[d] with . . . *Farr* . . . that a defendant does not have to personally commit a sexual assault to be subject to mandatory consecutive sentences under section 667.6, subdivision (d)." (*Id.* at p. 531.)

On this record, we need not determine whether the trial court erred in imposing mandatory full consecutive sentences pursuant to section 667.6, subdivision (d) or whether doing so was a Sixth Amendment violation because the trial court made clear that it was also sentencing defendants to full consecutive terms under its discretionary authority under section 667.6, subdivision (c).[12] The defendants do not dispute that the trial court had discretion under subdivision (c) to impose consecutive terms. The trial court expressly stated its intention to invoke its discretion under subdivision (c) to impose consecutive sentences even if the offenses did not occur on separate occasions, and the court explained that its decision was based on the horrific nature of the offense, including the multiple aggravating factors that it found true. (*People v. Belmontes, supra*, 34 Cal.3d at p. 349 [trial court is required to identify criteria to justify sentencing under § 667.6, subd. (c)].) The defendants do not contend that the trial court failed to provide adequate reasons for exercising its discretion under subdivision (c) or that it abused

---

[12] Although we need not address the defendants' section 667.6, subdivision (d) arguments, we note that the California Supreme Court recently rejected the claim that subdivision (d) violates the Sixth Amendment because the court, rather than the jury, makes the "separate occasions" finding. (*Catarino, supra*, 14 Cal.5th at p. 750.) Quintero's counsel notified us of the recent decision in *Erlinger v. United States* (2024) 602 U.S. 821 [219 L.Ed.2d 451], which addresses whether a judge may decide that a defendant's past offenses were committed on separate occasions under a preponderance of the evidence standard in sentencing a defendant under the Armed Career Criminal Act (18 U.S.C. § 921 et seq.) or whether the Fifth and Sixth Amendments require a unanimous jury to make that determination beyond a reasonable doubt. (*Erlinger*, at p. 458.) It held that a jury must resolve the factual question unanimously and beyond a reasonable doubt. (*Id.* at pp. 464–465.) As discussed *ante*, we find that the trial court properly relied on section 667.6, subdivision (c) and therefore we need not address the Sixth Amendment issue raised regarding subdivision (d) or the possible impact of *Erlinger* on that issue.

that discretion. Rather, their arguments all address only the trial court's application of subdivision (d). Even if we were to assume that the trial court erred in relying upon subdivision (d), any error was "cured" by the court's proper reliance on subdivision (c). (*People v. Corona* (1988) 206 Cal.App.3d 13, 18 [finding trial court's error in relying upon § 667.6, subd. (d) "was cured by identical and lawful alternate sentencing under section 667.6, subdivision (c)"]; *People v. Pena* (1992) 7 Cal.App.4th 1294, 1313–1318 [finding trial court erred in relying on § 667.6, subd. (d), but affirming full consecutive sentences because trial court properly invoked § 667.6, subd. (c), as well].)

We reject the defendants' argument that a remand for resentencing is necessary because "[o]n remand, the court's reevaluation of whether the evidence supports the imposition of section 667(d), under the correct legal standard, could conceivably influence the court to revisit its decision under section 667(c)." We agree with the People that the record belies this argument and that a remand would be "an idle and unnecessary, if not pointless, judicial exercise." (*People v. Coelho* (2001) 89 Cal.App.4th 861, 889.)

The defendants also assert that at a new sentencing proceeding they could bring a motion to strike "this discretionary enhancement under section 1385(c), which was recently enacted by Senate Bill No. 81." Unsurprisingly, defendants cite no authority for their assumption that section 667.6 is an enhancement. Section 667.6 is an alternative sentencing scheme, not an enhancement. (*People v. Farr, supra*, 54 Cal.App.4th at p. 843.) Moreover, Senate Bill No. 81 (Reg. Sess. 2021–2022) became effective on January 1, 2022, and the defendants were sentenced on May 11, 2022. The defendants forfeited this claim by failing to raise it below. (*People v. Coleman*

41

(2024) 98 Cal.App.5th 709, 723–724 [defendant forfeited the claim that his enhancements should have been struck under amended section 1385 by not asking the trial court to strike them].)

## DISPOSITION

The judgments are affirmed.


Jackson, P. J.


WE CONCUR:

Simons, J.
Burns, J.

<u>A165276, A165277/People v. Quintero, People v. Lopez-Flores</u>

Trial Court:          Superior Court of the County of Sonoma

Trial Judge:         Christopher Honigsberg

Counsel:           Law Office of Geoffrey Jones and Geoffrey Jones, under appointment by the Court of Appeal, for Defendant and Appellant Quintero.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant Lopez-Flores.

Rob Bonta, Attorney General, Lance E. Winters and Jeffrey M. Laurence, Assistant Attorneys General, Donna M. Provenzano and Melissa A. Meth, Deputy Attorneys General, for Plaintiff and Respondent.